**Mohinder S. GOOMAR, M.D., an incompetent person By and Through his Guardian Ad Litem, Shukla GOOMAR, M.D., Plaintiff–Appellant,**

v.

**CENTENNIAL LIFE INSURANCE COMPANY, a Kansas corporation; Sentry Life Insurance Company, Defendants–Appellees.**

No. 94–55687.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted Sept. 14, 1995.

Decided Feb. 21, 1996.

■

Patrick L. Prindle and Joseph L. Oliva, Duckor & Spradling, San Diego, California, for plaintiff-appellant.

Robert H. Roe, Jr., Luce, Forward, Hamilton & Scripps, San Diego, California, for defendants-appellees.

Before: RYMER, T.G. NELSON and KLEINFELD, Circuit Judges.

T.G. NELSON, Circuit Judge:

## I.

Mohinder Goomar appeals the district court's grant of summary judgment for Centennial Life Insurance Company (Centennial) and Sentry Life Insurance Company (Sentry) on his claim for disability benefits. Dr. Goomar claims that his psychological disability led to the conduct that caused the loss of his medical license and his inability to work and that he is therefore entitled to disability benefits. We have jurisdiction under 28 U.S.C. § 1291, and we affirm the district court's grant of summary judgment for Centennial and Sentry.

## II.

Doctor Mohinder Goomar established a private ear, nose and throat medical practice in New York in 1971. The practice grew and prospered until April 1984, when a female college student publicly accused Dr. Goomar of making sexual advances and molesting her during an after-hours office examination. Two other women had previously complained of similar misconduct by Dr. Goomar in 1981 and 1983. A fourth victim reported a 1980 molestation after the 1984 victim's charges were made public.

As a result of these accusations, the Regents Review Committee of the University of the State of New York initiated license revocation proceedings. Dr. Goomar vigorously defended himself during the administrative hearings before the Review Committee, arguing that he was fit to practice medicine

and wished to continue doing so. In addition, Dr. Goomar's wife, Shukla Goomar, and several personal friends and professional colleagues testified on Dr. Goomar's behalf. At no time did Dr. Goomar or any of the other witnesses testify that Dr. Goomar was suffering from any type of mental disorder that might have caused or contributed to the molestations.

The Review Committee found that Dr. Goomar violated provisions of the New York Education Law and was morally unfit to practice his profession within the meaning of the New York Administrative Code. Dr. Goomar's license was therefore revoked, effective June 8, 1987.

Shukla Goomar testified in her deposition in this case that her husband began having trouble sleeping and first showed signs of serious mental difficulties in April 1989. In September 1989, Mrs. Goomar caused her husband to be involuntarily committed to the psychiatric unit of the Albany Medical Center Hospital. Dr. Goomar told Dr. Sae Chung, his attending psychiatrist at Albany Medical Center, that he had "never had any psychiatric problem before."

Dr. Chung and psychologist John R. Thibodeau, Ph.D., performed extensive testing of Dr. Goomar during his confinement at Albany Medical Center. Both Dr. Chung and Dr. Thibodeau testified that they found no evidence of schizophrenia in Dr. Goomar in 1989, instead diagnosing Dr. Goomar as suffering from "Major Depressive Affective Disorder, Single Episode, Severe With Psychotic Behavior." Dr. Thibodeau testified that this condition was brought on by "the significant life changes [Dr. Goomar] had undergone as a function of having lost his medical license and the [resultant] changes in his life since having lost it...." After two weeks of drug therapy, Dr. Goomar's condition "improved dramatically," and he was discharged from Albany Medical Center.

In 1991, Dr. Goomar again experienced psychiatric difficulties. He started seeing Dr. David Garmon, who diagnosed Dr. Goomar as suffering from paranoid schizophrenia. Based upon the history given to him by Dr. Goomar and Mrs. Goomar, Dr. Garmon

concluded that Dr. Goomar had experienced this disorder as far back as 1982.

In March 1992, Dr. Goomar submitted a claim for disability benefits to both Centennial and Sentry. Dr. Goomar claimed that his psychological disability led to the conduct that caused the loss of his medical license and his inability to work.

Both Centennial and Sentry, acting independently, investigated Dr. Goomar's claims and denied the claims on the ground that Dr. Goomar had failed to satisfy policy requirements for payment of disability benefits.

After Centennial and Sentry refused to pay his claims, Dr. Goomar filed suit in the California Superior Court. Centennial and Sentry removed the matter to the United States District Court for the Southern District of California. The parties brought cross-motions for summary judgment in January 1994 and February 1994. On March 14, 1994, the district court granted Centennial and Sentry's motion for summary judgment and denied Dr. Goomar's motion for summary judgment. Dr. Goomar timely appeals.

### III.

■ We review the district court's grant of summary judgment *de novo*. *Jesinger v. Nevada Fed. Credit Union*, 24 F.3d 1127, 1130 (9th Cir.1994). The appellate court must determine, viewing the evidence in the light most favorable to the non-moving party, whether there are any genuine issues of material fact and whether the district court correctly applied the relevant substantive law. *Id.*

#### A. Total Disability

To be eligible for disability benefits under both the Centennial Policy and the Sentry Policy, a claimant must be an eligible member of the plan and be totally disabled. Under both the Centennial Policy and the Sentry Policy, an "eligible person" is one who is an active member of the plan who is "actively performing the full-time duties of his" profession or occupation.

■ When Dr. Goomar ceased to actively perform the full-time duties of his occupation

in June 1987, he was no longer an eligible member of the plan under either the Centennial Policy or the Sentry Policy. Once Dr. Goomar's status as an eligible member ended, he was not entitled to further coverage under either policy and could not claim benefits for disabilities arising after that date. Thus, the issue is whether Dr. Goomar met either Centennial's or Sentry's Policy requirements for disability benefits prior to June 1987.

### 1. The Centennial Policy

The Centennial Policy provides that disability benefits will be paid under the following conditions:

(1) Total Disability exists . . . ; and

(2) The Insured receives the Regular Care and Attendance of a Physician.

"Total disability" is defined, in relevant part, as:

Sickness or Injury which totally and continuously prevents an Insured . . . from performing the material and substantial duties of that specialized area of practice. . . .

"Sickness" is defined as:

Sickness or disease which causes the Insured to be totally disabled for a period of time. The Sickness must begin while the Insured's coverage is in force.

■ Dr. Goomar claims that the district court committed reversible error by misconstruing the language of the Centennial and Sentry policies. He claims that his mental "sickness" caused him to molest four female patients, which resulted in his license being revoked, and that his sickness therefore rendered him totally disabled. We disagree.

Diane Mohr, who worked as a nurse for Dr. Goomar between January 1976 and August 1982 and between April 1985 and September 1986, stated that Dr. Goomar never demonstrated odd or irrational behavior and that he maintained a normal work schedule. She never received any complaints from patients regarding Dr. Goomar's conduct.

Donna Hladik, who worked part-time for Dr. Goomar from approximately 1979 to 1984, stated that she never saw Dr. Goomar do anything improper, never noticed an inability on the part of Dr. Goomar to perform the duties of his practice, and never noticed any emotional or mental problems of Dr. Goomar during that time. She also had never received any complaints from patients regarding Dr. Goomar's conduct.

Shukla Goomar, who was Dr. Goomar's office manager as well as his wife, testified that she did not feel that her husband needed psychiatric help at the time the molestations were occurring. She also testified that she has "no way of knowing" whether her husband was disabled in 1987 when he lost his license. Testifying on her husband's behalf at the license revocation hearings, Shukla stated that she felt her husband was a competent doctor. She never mentioned anything to the Review Committee about the mental problems that Dr. Goomar now claims he had at the time.

Dr. Arthur Isenburg, who had observed Dr. Goomar working with patients at Saratoga Springs Hospital in New York, believed strongly enough in Dr. Goomar's competence that he testified on Dr. Goomar's behalf at the license revocation hearings. He stated, "I would not have so testified if I had any personal or professional reservations concerning Dr. Goomar's competency or abilities as a physician."

At the license revocation hearings, Dr. Goomar vigorously defended himself, arguing that he was fit to practice medicine and wanted to continue doing so. He did not mention anything about the mental problems that he now alleges he had at the time.

In 1989, Dr. Goomar told Dr. Sae Chung, his attending psychiatrist at Albany Medical Center, that the psychiatric problems he was having had started only six months prior to his admission to Albany Medical Center in September 1989, and that he had "never had any psychiatric problem before." After extensive testing, Dr. Chung and Dr. Thibodeau concluded that Dr. Goomar's mental illness at that time was a single episode of a severe major depressive affective disorder with psychotic behavior, specifically ruling out paranoid schizophrenia. Dr. Thibodeau determined that this condition was brought on by the significant life changes that Dr.

Goomar had undergone as a result of having lost his medical license.

Dr. Goomar continued practicing medicine until his license was revoked in 1987. There is no evidence that he molested anyone after April 1984, and the evidence indicates that he practiced competently for three years after the last incident with no apparent disabling effects from his alleged "sickness." As Dr. Lipian, the appellee's designated expert psychiatrist, stated:

If this condition truly caused Mohinder Goomar to be totally disabled, it could only do so by depriving him of an ability to control his own action. After April 1984, it appears that Dr. Goomar, untreated in any way, practiced competently for three more years with no further incidents involving female patients. These facts suggest that he did have the ability to control his own actions, and he chose to stop such unprofessional behavior as soon as he was publicly accused of improper sexual conduct with patients.

Dr. Goomar has failed to raise a material issue of fact as to whether his alleged "sickness" caused the loss of his license and thus his alleged "total disability." We therefore affirm the district court's grant of summary judgment for Centennial.

### 2. The Sentry Policy

The Sentry Policy provides that monthly disability benefits will be paid under the following conditions:

If total disability of the Insured commences while the policy is in force as to the Insured ... the Company will pay the amount of the Monthly Indemnity stated in the Schedule applicable to the Insured for each month ... throughout which such total disability continues beyond [the] Elimination Period....

The Policy defines "total disability" as:

disability caused by injury or sickness commencing while the policy is in force as to the Insured, which prevents the Insured from performing the duties of his then current occupation, beyond the end of the elimination period and which requires the regular care and attendance of a currently licensed physician or surgeon other than the Insured....

"Sickness" is defined as:

Sickness or disease which causes a period of total disability commencing while the policy is in force as to the Insured.

The analysis of Dr. Goomar's coverage under the Sentry Policy with respect to total disability is the same as the analysis under the Centennial Policy. Thus, for the reasons previously stated, we hold that Dr. Goomar has failed to present a material issue of fact as to whether his alleged "sickness" caused the loss of his license and thus his alleged "total disability." We therefore affirm the district court's grant of summary judgment for Sentry.

### B. Exclusion of Dr. Garmon's and Dr. Gottschalk's Testimony

Dr. Goomar claims that the district court's rejection of Dr. Garmon's and Dr. Gottschalk's deposition testimony as unsupported speculation was erroneous. We need not determine whether the district court's exclusion of this testimony was erroneous because admissibility of the doctors' testimony would not change the result in the present case.

Dr. Goomar relied on the testimony of Dr. Gottschalk and Dr. Garmon to establish that he was disabled by schizophrenia in 1985–87, the period of his license revocation, or 1981–84, the period of his misconduct leading to his license revocation. However, neither doctor testified to facts or opinions which would establish a genuine issue of fact.

Dr. Gottschalk, when asked at his deposition whether he had an opinion about whether Dr. Goomar suffered from paranoid schizophrenia between 1985 and 1987, testified that "I frankly don't have much information about that period of time." He first saw Dr. Goomar in 1993, and felt that he had "to maintain a certain amount of skepticism" about what Dr. Goomar told him. Although he initially gave the opinion that Dr. Goomar was disabled when he misbehaved sexually in the 1980's, he subsequently qualified this opinion away. He said it "was based entirely on [Dr. Goomar's] subjective reports," which he had testified had to be taken skeptically,

and that confirmation from nurses and secretaries who worked with Dr. Goomar at that time would be needed "to get some external validation of the onset of his schizophrenic disorder."

Dr. Garmon initially opined that Dr. Goomar was probably disabled by schizophrenia, without which the sexual molestations would probably not have occurred, beginning in the 1970's. This was based on what Dr. and Mrs. Goomar had told him. But he too said his opinion depended entirely on what the Goomars told him. He went further and expressly refused to allow himself to be used as an expert witness. He testified that "I would not serve as an expert witness in this case," because he thought the duty to render an objective opinion would conflict with his "therapeutic alliance" with his patient.

Dr. Gottschalk's express qualification away of his opinion, and statement that it would require confirmation by people who had worked with Dr. Goomar at the relevant time, and Dr. Garmon's express refusal to testify as an expert about Dr. Goomar's condition at any relevant time, left Dr. Goomar without any witness who would testify that he was disabled by schizophrenia at any time relevant to his case.

In the face of very substantial evidence that he was not disabled at any relevant time, Dr. Goomar failed to provide a witness who would provide facts or an opinion to the contrary. Dr. Goomar thus failed to provide cognizable proof that a genuine issue of material fact existed. Sentry and Centennial were therefore entitled to judgment as a matter of law. *See* Fed.R.Civ.Proc. 56(c).

The district court's grant of summary judgment is affirmed.

AFFIRMED.